May it please the Court, Armin Skolmowsky for petitioner, Ms. Kusnanto. I'd like to reserve two minutes for rebuttal. First, I'd like to discuss the credibility issue in this case. Prior to the commencement of any merits hearing with the Immigration Court or judge, the judge will give the petitioner the opportunity to update, make corrections, make amendments, make additions to their statements or applications. In this case, Ms. Kusnanto did that, as well as submit an additional statement prior to the hearing which reflected testimony that she gave at the asylum hearing prior to the court. Would she have a right to do that? But are you saying because you have the right to do that, that the court can't look at it and say, I can't believe you missed that in the initial one? It's sort of like if your basis for persecution is I was there and they came in and they killed my entire family in front of me, all right, and made some statement or whatever. But then when you have an opportunity to update, that's when you decide several years later that you're going to update that your whole family got killed right in front of you. The court still, they can let you update, but then that court can also say it's pretty hard when you're asked what's happened to you that would amount to persecution or torture or any of those things, that you could have left out that your whole family was killed in front of you, right? Well, Judge, in this situation it wasn't several years, it was a couple of years. And it was actually, it was a master calendar hearing and there was a merits hearing. So she submitted all the documents. But what I'm saying is you have a right to do it, but the court can still look at it. Is that something that I think you would have said in the first place? And you're saying it now because. Well, no, Judge. She said that she told the asylum officer that this event had occurred. I mean, why isn't, I don't know. The BIA says she didn't tell the asylum officer. Her testimony was she did tell the asylum officer. Why isn't that what you're arguing about and why isn't that sufficient reason to remand the case because they found it on an erroneous factual basis, period? Well, I agree, Judge, and also. But you certainly never said this very clearly. You didn't just say that to Judge Callahan, but in fact the BIA found that she didn't tell the asylum officer even though she flatly said she did. Well, Judge, correct, and I argue that, you know, that's incorrect. All right. And also in regards to the daughter actually corroborates that the mother, you know, the events that occurred in 2006, she corroborates in her testimony what had occurred to the mother. And the judge basically admits without objection the statement. The government doesn't say anything about it, doesn't ask her about it. We ask her about it. All the judge says to her, did you tell the officer this? And she says, yes, I did. That's it. All right. And then the IJ finds she didn't, and the BIA finds she didn't, and as a basis for finding her not credible, and they don't find any reason to disbelieve what she said she told the officer. Nobody says she lied about that. Correct. So this, I mean, for that reason, substantial evidence would compel reversal of the credibility determination in this matter. As to the ---- All right. Where does that get you? There also was some ---- there was something said by the IJ or the BIA or both about the fact that she didn't, in fact, say that there was a threat to her house or something like that. But, in fact, she did say that. Well, there was two incidents. There was one incident where she was going to the hospital and she was basically attacked by these people with knives, and they called her Chinese. Die, die, die. And the statement did not mention knives. She added that detail in the testimony. And the IJ ends up saying, well, you know, you didn't mention knives. You didn't mention the racial insults. And, actually, it's just that she added some detail during testimony, which this Court permits. There's case law that supports that. We did cite that. So, and the BIA doesn't really discuss that too much or even at all. They mainly ---- Kagan. All right. But what I'm trying to find out is what did the IJ and the BIA say that she said that it's just flat wrong? Well, one of them was this thing about what she told the asylum officer. I thought there was a second having to do with the threat, with the threats to her house. At some point, they said she didn't say that and she did say it. But I can't ---- Well, yes. Mainly it's what they call the omission of these two incidents from ---- All right. You're talking about omissions and I'm not. Go ahead. Right. What about, let's assume that she's credible. Then what? Well, Judge, we would argue that in the cumulative, she suffered past persecution. We detailed in the brief the events of the 98 riots. The 1999, she was targeted because she was ethnic Chinese. She discusses constant sexual harassment, battery by Muslims on the street, at public transportation, in public. She talks about 2006 incidents where she's targeted by these anti-Chinese Muslims as she's ---- Did the IJ find that she is not a member of a disfavored group or did the BIA affirm that finding? Well, it's funny because the IJ kind of like made his own standard and I mentioned that, too, is that he talks about this like enhanced ---- All right. But the BIA says we cannot find error in the immigration judge's conclusion that the Respondent is not a member of a disfavored group. Was that the finding, the holding of the BIA? Right. Well, they ---- Okay. Is that consistent with our case law? Well, they ---- Not. Just not heightened on anything, not. I don't believe so because I think you are an ethnic Chinese Indonesian Christian. Okay. You fall under disfavored group with two cases. You've got Sayal, you've got Tapu Bulon, you've got Macari. Including the last case, Halim, right? That still didn't say it wasn't ---- But it didn't say it wasn't a disfavored group, did it? No.  Halim just mentions, and in all deference to the judge who wrote this brief, wrote this case, authored this case, the Halim mentioned is not severely disfavored. All right. But it didn't say it was not a member of a disfavored group. No, absolutely not. And the BIA found he was not a member of a disfavored group. Right. And then the judge basically, he has this ---- he throws in this idea of a high level ---- she did not demonstrate a high level of ---- The judge doesn't matter. The BIA matters. The BIA found he was not a member of a disfavored group. Right. That's incorrect, Judge. And we discussed that. It's not correct. I mean, she obviously is just by definition of her ethnicity and her religion. And at the case, at the time, I believe Thumper Boland was not published, but was published subsequent to this case, and we did cite that. And she has problems as an ethnic Chinese and as a Christian. And, you know, she has enough incidents to meet this burden of a comparatively low level of individualized risk. I mean, she discusses all these events, all these years that occurred to her, her family. Her sons send her letters talking about their church being threatened with bombs, they're being attacked. All these things together, given the lower standard, would qualify her for asylum under the disfavored group analysis. Unless there are any other questions, I believe my time is up. Okay. We'll give you rebuttal time. Thank you. Good afternoon. May it please the Court, Attorney Sabatino F. Leo on behalf of the United States Attorney General. I think it is clear with regard to the two aspects of this particular case, the credibility analysis and the disfavored group analysis. And I think really if we will focus initially on the credibility analysis. All right. On the credibility analysis, didn't the BIA rely on a flatly wrong fact? Well, with regard, I think what I think. At least one, and I think two. I think what the BIA did with response to her testimony in incorrectly assessing because the testimony is not very clear. She said she did it, but then she said she told her lawyer. They said, did you tell the asylum office for this? And she said yes. She said I did, and then she spoke further with respect to whether or not my lawyer told me to put it in there, et cetera. But I think what's important to stay clear and to stay focused on really is the two affidavits here. It's the affidavit, and they're both on, they're on pages 170, 172 of the administrative record and 178. And one is written in 2007 and one is written in 2009. And that really is the focal point of the adverse credibility analysis with regard to these. So we should just ignore that they had their facts wrong? Excuse me, Your Honor? Just ignore that they had the fact wrong and never accounted for the fact or dealt with the fact that she said she did tell it to the asylum officer. I wouldn't suggest we ignore it whatsoever, Your Honor. But I think that in order to properly assess the adverse credibility analysis and what was specifically highlighted in the agency's decisions with regard to the adverse credibility analysis was a 2007 statement versus a 2009 statement. Both statements that are written that are part of the administrative record, and both of those statements not conflict in the sense of the 2009 statement provides embellishment in support of one's past persecution in Indonesia, whereas the prior statement failed to include it. And those two omissions slash embellishments using the terms of the agency specifically provided one failed to account for the assault by the Muslim men with knives and as well as the incident involving going to the neighbor's house and you're pro-American, and if you're pro-American, we're going to burn your house down. So these two particular embellishments I think is really what the focus needs to be on. Can you give an adequate opportunity to explain? Because obviously you can point, if you point something out, then the law also requires that you provide an opportunity to explain the 2006 omissions. What's your response? Well, my position is that in the record, it is in the record in the question and answer session, from what I recall from reading the question and answer session, the testimony is that she was provided an opportunity to explain the differences because those two differences were highlighted. I don't recall offhand specifically her response to that other than I think what it was is exactly what it's been. Well, her explanation was I did tell it to the asylum officer, and my lawyer didn't tell me, didn't put it in the statement. And that was just never dealt with. The fact that she says — I mean, this is why the question — the fact that she said she told the asylum officer is so important. You can't assess her explanation if you leave that out and say the opposite about it. And I understand Your Honor's concern with regard to that, but the idea that my — the she wrote this in 2007 as part of her sworn asylum application. Again, remember, this is not a situation in which we're reviewing a regurgitation of her events from the asylum officer. We're reading her statement that was submitted in support of — Right. And it was part and parcel of her explanation for why it wasn't in there, that she had in fact told it to the asylum officer and her lawyer, but her lawyer didn't put it in there. And the agency didn't buy her — Did it say that? Well, this is — we're talking about a situation — this is a real I.D. case, all right? So the agency is sitting there making that determination based upon a totality of the circumstances. Well, you're saying it's inherent in what they found. Well, I — If you did believe she said it, then it wouldn't be a discrepancy. Well, Your Honor, I — No, if you believe that she actually did put it in the other one, you wouldn't say it was an omission, right? I wouldn't say it is an omission if it was actually placed in the original 2007 statement. Of course not. But it was not placed. And when you look at them side by side — But the I.J. — or the BIA would have been free at that point to say, hey, I think that she did put it in there, and so I'm not going to hold it against her when I look at these two applications. They did hold it against her because they — it's inherent in holding it against someone that they're different. Agreed. I concur. I concur 100 — Okay. Let me ask you this. Is it the government's position that the incidents in this case themselves do not rise to the level of persecution, or that there is insufficient evidence tying these incidents to Kusnanto's ethnicity and or religion as required to establish persecution, or is the government contending both of those? I think we're — I say we're exactly contending them both. I think number one, with the answer to your initial question, is that based upon Ninth Circuit case law that we cite in our particular brief, these incidents specifically related to her, not with respect to what incidents happened to her daughter, who was granted asylum in 2008, and not incidents with regard to her son, but specifically related to her are indicative of discrimination. And this Court has repeatedly held that discrimination, harassment does not rise to a level of persecution for purposes of the INA and for purposes of asylum and withholding. And with regard to your — with regard to the second question, I think what's abundantly clear, and I think what's confusing, and I think what's — Okay. She got hit and — if she was hit and run, and if it was a result of people that were doing that because of her, you know, ethnicity or religious beliefs, that could be persecuted. It could potentially. But I think to answer your second question, which is what I was getting to, is that there's nothing that ties the two together other than significant patents of harassment and discrimination for ethnic Chinese in Indonesia. And that's why I think we're — and I don't want to get far afield of the adverse  All right. Let me — Yes, ma'am. I finally did find the other instance in which it seems to me the IJ's findings were incorrect. She says, Finally, she stated that she felt threatened by officials and neighbors coming to her home questioning whether her daughter had become pro-American. She did not, however, testify to any threat or harm that came about as a result of these inquiries. Yes, she did. She said they threatened to burn her house down. But there was nothing subsequently occurred as a result of those — The what? They said there were no threats. There were threats. There was an indication that they would — right? And you also have — I think we have to take it to — Let's go to something else. What about the disfavored group? The BIA found that this is not a disfavored group. Isn't that completely inconsistent with our case law? Ethnic — and I think the way — the agency's decisions have to really be read, right? They have to be read as one in the sense of the IJ and the board's decision. I think what these Ninth Circuit decisions say is that ethnic Chinese are a disfavored group. Ethnic Chinese Christians are a disfavored group. And I think what the agency does here in making that determination with regard to well-founded fear of future persecution with regard to this particular individual is that there was no tie-in specifically with regard to the religious minority, i.e., the Christianity. And there really wasn't, which takes it out of the realm of this case's decision in Tampilong that talks about severely disfavored group. And what it goes — and I think what it does is — Here is the sentence. Here, it does not appear that the evidence of record establishes that the Indonesian government condones discrimination against ethnic Chinese, comma, including those who are Christian. And therefore, we cannot find an error in the immigration judge's conclusion that the respondent is not a member of a disfavored group. Now, isn't that just flatly inconsistent with our case law? That statement in and of itself read in that particular — read that way is inconsistent with regard to sale. But subsequent to sale, Lolong and Hacksom and Hallam talk about how improvements and significant improvements have continuously been made with — and I think it's not this disfavored group analysis stagnant approach, because I think everybody would concur that. Sale, they said they were severely disfavored. And then subsequent to sale, this Court in Lolong and Hallam and Hacksom, sorry, started to talk about how the government is making significant improvements, and based upon those — All right. So you think we should now review the question of whether it's not a member of a disfavored group, not apply Hallam, which says that it's a — which is what you did in your brief, which was to say that it's a lowered standard.  Yes. But that's not what they said. Well, that's — I think that read — I think it's — I think the agency's decisions are, in fact, confusing in that regard. I think what the agency is saying here when read together is that subsequent to all this, that she can't tie it to ethnic — she can't tie it to Christianity because it takes it out of Tampulong, and as a result, it's a very low standard for purposes of a disfavored group analysis. Well, that's what you wish it said, but it isn't what it said, right? No, that is correct. And I think they do a very poor job in respect to that particular element. But I think, again, what we have to do is really read these agency decisions together and really tie into what the standard is here, right? Does it compel a — does the substantial evidence support the agency's conclusion here? And I really want to hearken us back, and I don't want to go over my time too long here, with regard to this adverse credibility decision, right? We can't sit in place of the agency. The agency's there making that determination. I can look and see whether they have made flatly erroneous factual statements, and I just gave you two. That is correct, Your Honor. That is correct. But for purposes of the adverse credibility decision, those two — what was specifically relied upon by the agency were those two statements, one with regard to the assault by the Muslims with knives, and then a subsequent with regard to being called out for hurling racial insults at her, and when her mother and neighbor were harassed by the — because of the daughter's move to the United States. Those two, when comparing those two documents, it's pretty specific. And I think, as Your Honor indicated — Your Honor Callahan indicated initially is that simply because she has the right to amend, it doesn't mean we need to throw it out and say, okay, whatever she said previously is incorrect. Kagan.    Go ahead, Your Honor. I just have one other question. I don't remember. These cases do run together in one's head when you're reading a bunch of them. Was this a case in which there was also a concern about whether she adequately went to the police or not? Yeah. There was indication that she did not go to the police on a number of occasions because in one situation with regard to the hit-and-run, there were no witnesses, and there's also indication in the record that she felt there was no going to the police to do that. But she did go on a number of occasions. Yes. And she said they asked for bribes and so on. They asked for money, et cetera, for purposes of the case. All right. And so was she faulted for showing that that was — what I can't remember is whether part of the reason that she was turned down was on the theory that the government was not, you know, unable or unwilling. Was that another part of it? Well, that was part of it with regard to subsequent to the adverse — if we get beyond the adverse credibility decision. Okay. Okay. That's part of it because — She went to the — she went to the — she went to the police and was asked for money at one point. On the hit-and-run, I believe she went to the police. There was no asking for money, but they told her since no one saw it, they couldn't catch the people that were — There were authorities present. There were no witnesses, so there was nothing to be done at that particular — But she said the police never do anything. Never do — exactly. And that's — you know, that's exactly — that's been — that's her testimony. It would be — But this is not the usual case in which she wasn't trying. She was trying. She went at least twice, we know, to the police. Yeah. And there is indication in the record, Your Honor, that she was trying, and I — That's a third problem. Your issue, Your Honor, and I understand — assuming we get beyond, again, I think the substantial evidence review with respect to the adverse credibility decision, I don't think we can get far afield of that here. All right. Thank you, Your Honor. Thank you very much. Thank you, Your Honor. All right. Judge, briefly on the additional statement issue, once again, as Judge Callahan said, she was never challenged on this issue. The judge says, you know, did you tell the asylum officer? Yes, I did. Well, okay. And that's — move on. I mean, the government said nothing. She testified to these events. The daughter comes in and testifies to these events. They could have called the asylum officer. They could have submitted the assessment for review that they always get from the asylum office, would have said what she said or not said at the asylum office. Well, you could have done that, too, right? Well, no, not really, Judge. The government is the one that subpoenas their own people. I mean, why would I at this point? I mean, nobody challenges her. They accept it. Well, because if she's telling a different story now and she's going to be asked about it, you want to, you know. And, Judge, we brought the daughter in. And she came in and she testified to the events that her mom discussed in the 2006 incidents. And it was corroborated. And to go to the police and she — And her mom did what with regards to the 2006 incidents? Well, the two incidents from the additional statement, there were two incidents from 2006. She confirmed that they happened.  No, but she confirmed that they happened. So the daughter comes in and says, yes, this happened to my mom, you know, in 2006. She was attacked on the way to the hospital. And also she was threatened because they asked about whether or not I applied for asylum. And so we corroborated those events. And the judge, they said nothing. And government said nothing. No impeachment, nothing. So at that point, and nothing is said. And then finally the decision comes and he goes, well, you know, you did this statement prior to the hearing. And that's not credible. It's not an admission. All right. Thank you. Your time is — Thank you, Justice. Well, not quite. You have eight seconds. I do. All right. Thank you. All right. The case of Unitas — I'm sorry.   All rise. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Wallace, Berzon, Callahan